# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

*In re:*

EUGENE ALLEN GREGORY )  CHAPTER 7
    SSN: XXX-XX-9283 )  CASE NO. 10-35903-MER
DENISE MARYANNE BLODIG )
    SSN: XXX-XX-9608 )

                  *Debtors,* )

ROSE BROMBERG, )

                Plaintiff, )
vs. )  Adversary Proceeding
 )
EUGENE ALLEN GREGORY and )  No. 11-01011 MER
DENISE MARYANNE BLODIG, )

                Defendants. )

## PLAINTIFF'S CLOSING ARGUMENT

Plaintiff Rose Bromberg, by and through undersigned counsel, submits Plaintiff's Closing Argument in connection with the Trial of this matter on February 7, 2013.

May it please the Court:

Ms. Bromberg respectfully submits that the evidence presented at trial demonstrates, by a preponderance of the evidence, that Defendants Eugene Gregory and Denise Blodig engaged in fraudulent conduct in extending, renewing and refinancing the debt they each owed to Plaintiff Rose Bromberg. As such, the debt owed by Defendants to Ms. Bromberg is nondischargeable.

### Proposed Findings of Fact

1.    From 1996 to 1998, Eugene Gregory and his wife Denise Blodig took out a series of loans from Ms. Bromberg. (Exhibits 14, 15, 16 and 17) (Testimony of Rose Bromberg, Trial Transcript 67:1 to 70:4) (Testimony of Eugene Gregory, Trial Transcript 168:8 to 171:12)

2.    In 1998, Mr. Gregory and Ms. Blodig agreed to consolidate the existing loans into a single new loan for $272,272.00. This loan was secured by a deed of trust granted by Mr.

Gregory and Ms. Blodig on a property known as the Elizabeth U Stor, a storage facility in Elizabeth, Colorado. (Exhibit 18) (Testimony of Rose Bromberg, Trial Transcript 70:5 to 72:6) (Testimony of Eugene Gregory, Trial Transcript 171:13 to 172:8)

3. In the fall of 2004, Mr. Gregory and Mike Gibbons, through the entity Sandy Hollow Development, LLC ("Sandy Hollow") obtained $950,000.00 from individual investors in six separate loan transactions and promised each of these investors payment from the proceeds from the sale of lots at the Preserve at Deerfield. (Exhibits 1 through 6 and Exhibit 37) (Testimony of Eugene Gregory, Trial Transcript 172:20 to 181: 23)

4. None of the loan agreements with the six investors identify the existence of any other investors in the property. (Testimony of Eugene Gregory, Trial Transcript 181:24 to 182:8)

5. In late 2004, Ms. Bromberg found out by mail that Elizabeth U Stor, LLC was in bankruptcy. When she contacted Mr. Gregory to inquire, he advised that there was a bankruptcy pending and they were trying to work things out with the bank. After a few months, he advised Ms. Bromberg that they weren't able to get the bankruptcy to work and that her money would be better off with the new project at the Preserve at Deerfield. (Testimony of Rose Bromberg, Trial Transcript 73:8 to 73:23)

6. At that time, Mr. Gregory presented a new project to Ms. Bromberg, the Preserve at Deerfield. He told her it was going to be a very lucrative project, and that she [Ms. Bromberg] would be able to get paid by moving her interest to the new project. (Testimony of Rose Bromberg, Trial Transcript 74:2 to 74:14)

7. Mr. Gregory advised Ms. Bromberg that if she did not release the Elizabeth U Stor property, he would turn the Chapter 11 into a Chapter 7 and write off her entire loan. He told her she would lose her investment and that moving her investment was the only way she could get paid back. (Testimony of Rose Bromberg, Trial Transcript 74:15 to 74:24)

8. Based on the information received from Mr. Gregory, Ms. Bromberg entered into a new loan agreement with Mr. Gregory and Ms. Blodig for $361,134.06 and released the deed of trust on the Elizabeth U Stor property on May 27, 2005. (Exhibit 18, page 11, and Exhibit 19) (Testimony of Rose Bromberg, Trial Transcript 74:25 to 75:21)

9. In connection with the 2005 loan agreement, Mr. Gregory and Ms. Blodig each agreed in writing that payments on the 2005 loan would be made to Ms. Bromberg from net proceeds resulting from the sale of the Lots at the Preserve at Deerfield. (Exhibit 19) (Testimony of Eugene Gregory, Trial Transcript 182:17 to 183:23).

10. Mr. Gregory also told Ms. Bromberg that she would be paid from the proceeds derived from the sale of the lots. (Testimony of Rose Bromberg, Trial Transcript 77:12 to 78:13)

11. At the time the parties entered into the 2005 loan agreement, Mr. Gregory and Ms. Blodig concealed from Ms. Bromberg the existence of six individual investors in the Preserve at Deerfield who had collectively invested $950,000.00 in the project and who were each promised

payment from the proceeds resulting from the sale of the Lots. Ms. Bromberg was never notified of the other investors and Mr. Gregory did not give her any information about encumbrances on the project. (Exhibits 1 through 6 and Exhibit 37). (Testimony of Rose Bromberg, Trial Transcript 78:14 to 79:1 and 87:12 to 87:16 and 116:3 to 116:14)

12. The Defendants' concealment was material; had Ms. Bromberg been made aware of the existence of the other investors, it would have affected her decision. (Testimony of Rose Bromberg, Trial Transcript 79:2 to 79:10)

13. Mr. Gregory asserts that he gave Ms. Bromberg "a verbal that told her we had investors that put in $950,000" but admits that he did not advise Ms. Bromberg of the names of the investors or the amounts of their respective investments. (Testimony of Eugene Gregory, Trial Transcript 185:7 to 188:2)

14. Mr. Bromberg's testimony that Mr. Gregory never advised her of the other investors is strongly supported by the testimony of Rex Weimer and David Archer, each confirming that they invested substantial sums in the Preserve at Deerfield project and that Mr. Gregory concealed the existence of the other investors from them as well. ((Testimony of David Archer, Trial Transcript 126:12 to 128:16 and 133:6 to 133 15) (Testimony of Rex Weimer, Trial Transcript 147:22 to 149:18)

15. Mr. Gregory did not advise Mr. Archer of the names of the other four investors. (Testimony of Eugene Gregory, Trial Transcript 177:15 to 177:19)

16. Additionally, unbeknownst to Ms. Bromberg, in or about April of 2005, Mr. Gregory had proposed and struck a deal with Rex Weimer wherein Mr. Weimer agreed to purchase and hold the Elizabeth U Stor property, and that Mr. Weimer and Mr. Gregory would split the profit from the resale of the Elizabeth U Stor property when sold at a later date. (Testimony of Rex Weimer, Trial Transcript 149:21 to 151:19)

17. At that time, Mr. Gregory advised Mr. Weimer that there was another investor in the Elizabeth U Stor property but that he [Mr. Gregory] would "take care of that" and move them to another property. (Testimony of Rex Weimer, Trial Transcript 150:22 to 151:4)

18. Mr. Weimer formed Eliz U Stor, LLC on April 28, 2005 for the purpose of purchasing the Elizabeth U Stor property. (Exhibit 41)(Testimony of Rex Weimer, Trial Transcript 151:20 to 152:8)

19. Rex Weimer confirmed that at the time he created Eliz U Stor, LLC in April of 2005, he had already made the deal with Gene Gregory to split profits (Testimony of Rex Weimer, Trial Transcript 152:15 to 152:18)

20. When pressed under cross-examination to state that the side deal with Mr. Gregory came about immediately prior to closing, Mr. Weimer rejected that contention and confirmed "We had cut the deal long before that". (Testimony of Rex Weimer, Trial Transcript 162:11 to 162:13)

21. Mr. Gregory's assertion that he entered into the side agreement with Rex Weimer AFTER the May 2005 loan transaction with Ms. Bromberg and immediately before closing is not credible and is a deliberate attempt to mislead the Court on a critical issue. (Testimony of Eugene Gregory, Trial Transcript 191:7 to 193:4)

22. At the time the parties entered into the May 2005 loan transaction, neither Mr. Gregory nor Ms. Blodig advised Ms. Bromberg of the agreement reached with Rex Weimer to purchase and hold the Elizabeth U Stor property, and to split the profit from the resale of the same property at a later date. (Testimony of Rose Bromberg, Trial Transcript 75:22 to 76:14 and 116:15 to 116:19) (Testimony of Rex Weimer, Trial Transcript 149:21)

23. The Defendants' concealment was material; had Ms. Bromberg been made aware of the side deal with Mr. Weimer, it would have affected her decision. (Testimony of Rose Bromberg, Trial Transcript 76:15 to 76:23)

24. Rex Weimer, through the newly formed Eliz U Stor, LLC, purchased the Elizabeth U Stor property on June 1, 2005, five days after Ms. Bromberg released her interest in the property. Exhibits 38 and 39) (Testimony of Rex Weimer, Trial Transcript 152:19 to 154:5)

25. The Elizabeth U Stor property was held for a year and was sold by Eliz U Stor, LLC on or about June 19, 2006. Mr. Weimer and Mr. Gregory split the profit on the sale in accordance with their earlier agreement. (Exhibit 40)(Testimony of Rex Weimer, Trial Transcript 154:6 to 155:18)

26. Mr. Gregory received proceeds of $147,000.00 from Rex Weimer as his share of the profits from the sale of the Elizabeth U Stor property in 2006. (Testimony of Eugene Gregory, Trial Transcript 196:13 to 196:15)

27. Ms. Bromberg has sustained damages in the amount of the May 2005 promissory note $361,134.06, plus interest under the 2005 agreement in the amount of $381,181.53, for a total of $742,315.59. (Exhibit 19)(Pretrial Statement Calculation of Interest)(Supported by Defendant's Schedule F as due and owing to Rose Bromberg – Exhibit 26, p.17).

28. Interest at 8% on the amount of the May 2005 note through March 15, 2013 would equal $226,310.67 for a total of $587,444.73.

## Applicable Law

### § 523(a)(2)(A)

29. Debts for money obtained by false pretenses, a false representation, or actual fraud are non-dischargeable under 11 U.S.C. § 523(a)(2)(A). With respect to nondischargeability claim predicated on false representation or actual fraud, a plaintiff must establish the following elements: (1) the defendant made a false representation, (2) the defendant made the false representation with the intent to deceive the plaintiff, (3) the plaintiff relied on that representation, (4) the plaintiff's reliance was reasonable, and (5) the debtor's representation

caused the creditor to sustain a loss. In re Vickery, 2011 WL 4963136 (Bkrtcy.D.Colo. 2011); In re Deerman, 482 B.R. 344, 367 (Bkrtcy.D.N.M 2012) See Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996).

30. A claim predicated on "false pretenses," requires a similar but different showing to a claim based on false representation or actual fraud, in that it requires the creditor to prove that the debtor created and fostered in the creditor a false or misleading understanding of the transaction. Evans v. Dunston, 117 B.R. 632 (Bankr.D.Colo. 1990); aff'd in part and rev'd in part on other grounds, 146 B.R. 269 (D.Colo. 1992). Such false understanding may be created through "a series of events, activities or communications." Id. It may, but does not have to, include a written or express false representation, and may consist of silence when there is a duty to speak. Id. To establish that a debt was obtained by false pretenses, the plaintiff must establish: (1) an implied misrepresentation or conduct by the defendant; (2) promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property, or credit to the defendant. In re Vickery, 2011 WL 4963136 (Bkrtcy.D.Colo. 2011); citing In re Hambley, 329 B.R. 382, 396 (Bankr.E.D.N.Y. 2005).

31. Section 523(a)(2)(A) is designed to render nondischargeable debts arising from conduct involving "moral turpitude or intentional wrong." In re Gelfand, 47 B.R. 876, 879 (Bankr.E.D.Pa. 1985).

32. The standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard. Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 661, 112 L.Ed 2d 755 (1991).

33. Under Colorado law, "the measure of damages in [fraud] cases is the 'benefit of the bargain' rule, designed to give a plaintiff his or her expectation interest for loss of bargain." Ballow v. PHICO Ins. Co., 878 P.2d 672, 677, n. 5 (Colo. 1994). Thus, a plaintiff is entitled to receive "the difference between the actual value of the property and what its value would have been had the representation been true." In re Mascio, 2012 WL 2884812; citing Otis & Co. v. Grimes, 48 P.2d 788, 791 (Colo. 1935).

Liability of Ms. Blodig Based on Partnership

34. If a husband and wife are partners in a business, separate from the marital relationship, both may be held responsible for the fraudulent acts of one of them. Spence v. Tatum, 960 F.2d 65, 66 (8th Cir. 1992; Sunkyong Int'l Inc., v. Anderson Land & Livestock Co., 828 F.2d 1245, 1249 (8th Cir. 1987).

35. Most courts make a distinction between spouses who are involved in a business or partnership relationship and spouses who are not operating a business, and generally hold that intent will not be imputed from one spouse to the other in the absence of a business relationship. See Allison v. Crescentia (In re Allison), 960 F.2d 481, 485 (5th Cir. 1992)(holding that the agency rule under which the fraud of one partner may be imputed to co-partners did not apply to spouses who were not jointly operating a business).

36. In each case where courts have imputed liability from one spouse to the other under §523(a)(2), both spouses had a business or partnership relationship independent of the marriage. See First USA, Inc. v. Savage (In re Savage), 176 B.R. 614, 616 (Bankr.M.D.Fla. 1994).

37. However, when spouses have a business relationship, courts will usually apply some variety of agency law to impute intent under § 523(a)(2). See Luce v. First Equip. Leasing Corp. (In re Luce), 960 F.2d 1277, 1284 n.10 (5th Cir. 1992)(per curiam)(holding that the existence of a marital relationship is irrelevant where a husband's fraud was imputable to his wife under § 523(a)(2) by virtue of their business partnership); Love v. Smith (In re Smith), 98 B.R. 423, 426 (Bankr.C.D.Ill. 1989)(holding that a husband's fraudulent used-car sale was imputable to wife preventing discharge of debt because dealership license was in wife's name and wife's signature was required on business checks).

38. Over a century ago, the Supreme Court established that a partner's fraud [can] be imputed to a debtor to make a debt non-dischargeable under § 17(a)(2) of the Bankruptcy Act, [the predecessor statute to 11 U.S.C. §523(a)(2)]. This is true not only where the debtor did not consent to h[er] partner's fraudulent acts, but where [s]he had no knowledge or reason to have knowledge of these acts. Federal Dep. Ins. Corp. v. Calhoun (In re Calhoun, 131 B.R. 757, 760-61 (Bankr.D.D.C. 1991).

39. Fraud pursuant to 11 U.S.C. § 523(a)(2)(A) can be imputed between spouses based on agency principles when there is evidence that the "innocent" spouse was involved in a business relationship with the "wrongdoing" spouse that gave rise to the debt. See In re Tsurukawa, 287 B.R. 515, 527 (oth Cir. BAP 2002)("In order to impute fraud to a spouse, there must be a partnership or some other agency relationship")(quoting In re Tsurukawa, 258 B.R. 192, 198 (9th Cir. BAP 2001); In re Banke, 275 B.R. 317, 329 (Bankr.N.D.Iowa 2002)("If a husband and wife are partners in a business, separate from the marital relationship, both may be held responsible for the fraudulent acts of one of them.

Liability of Ms. Blodig Based on Agency

40. The agency of the husband for the wife cannot be established merely by their marriage, but may be shown by circumstantial evidence. The agency of a husband for his wife may be shown by direct evidence or by facts and circumstances which will authorize a reasonable and logical inference that he was empowered to act for her or that she ratified his unauthorized acts. A wife by her actions and conduct may be estopped to deny her husband's authority to act as her agent for her in her behalf. Ethridge v. Perryman, 363 S.W.2d 696, 701-2 (Mo. 1963).

41. When a husband assumes to act for his wife and when his action naturally tends to accomplish her known wishes it needs but little evidence to warrant an inference that the agency was authorized by her. Slight evidence of the agency of the husband for the wife is sufficient to charge her where she receives, retains and enjoys the benefit of the contract. Bowen v. Lloyd, 589 S.W.2d 312, 317 (Mo.App.1979).

42.   Courts have in fact imputed liability under §523 fraud of one spouse to the other spouse based on an agency relationship. See e.g. Matter of Luce, 960 F.2d 1277 (5th Cir. 1992); In re Paolino, 75 B.R. 641 (Bankr.E.D.Pa. 1987); In re Walker, 726 F.2d 452 (8th Cir. 1984); Terminal Builder Mart v. Warren (In re Warren), 7 B.R. 571, 573 (Bankr.N.D.Ala.1980)(question "well settled" that "a debt arising from the obtaining of goods by false pretenses of a partner, acting for the partnership, constitutes a claim which is not dischargeable in bankruptcy as to the misbehaving partner, the partnership, or an innocent partner"); Citizens State Bank v. Walker (In re Walker), 53 B.R. 174, 179 (Bankr.W.D.Mo.1985) ("fraud of an authorized agent, without more, has continually been recognized as a ground of nondischargeability").

43.   A principal is liable to third parties for frauds and torts of his agent committed within the scope of the agency even if the principal did not authorize, justify, participate or know of the agent's actions. This rule of liability is not based upon any presumed authority in the agent to do the acts, but on the ground of public policy, that it is more reasonable that when one of two innocent persons must suffer from the wrongful act of a third person, that the principal who has placed the agent in the position of trust and confidence should suffer rather than an innocent stranger. This result can be reached similarly on the familiar ground that when an agent exceeds his authority, his principal cannot benefit of his act and at the same time repudiate his authority. He must take the benefit to be derived from the transaction subject to his agent's fraud. Aiello v. Ed Saxe Real Estate, Inc., 499 A.2d 882, 885-6 (Pa. 1985).

44.   If the debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable to the debtor-principal. E.g. David v. Annapolis Banking & Trust Co., 209 F.2d 343, 344 (4th Cir. 1953). Despite the debtors' lack of actual knowledge, courts have refused to discharge the debts because the debtors had no reason, good or bad, for their lack of knowledge. In other words, the debtors in those cases should have known of the fraud. It is clear, however, that failure to read a document prepared by one's agent before signing it is not the only kind of act which can constitute "reckless indifference." The debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud. See In re Savarese, 209 F.2d 830, 832 (C.A.2 1913).

45.   The principal is estopped from denying the agent's apparent authority where the principal has placed the agent in a situation where the agent may be presumed to act for her. Kahlman v. Bertacchi, 373 N.E.2d 550, 556 (1978). If plaintiffs established that the wrongdoer in a case was acting as the principal/debtor's agent at the time of the alleged fraud, then any fraud committed by the agent/wrongdoer within the scope of the agency would be imputed to the principal/debtor under § 523(a)(2)(A). In re Paolino, 89 B.R. 453, 459-460 (Bankr.E.D.Pa. 1988).

Additional Proposed Findings of Fact Regarding Denise Blodig

46.   Ms. Bromberg submits that the foregoing and following facts establish that (a) Ms. Blodig was a partner of Mr. Gregory's in the operation of all of Mr. Gregory's business projects including Elizabeth U Stor, LLC and Sandy Hollow Development, LLC, (b) Ms. Blodig was an active participant in the business dealings of Mr. Gregory, and (c) that Ms. Blodig had authorized Mr. Gregory to act on her behalf.

- Ms. Blodig acknowledged that she assists by owning parts of the businesses being managed by Mr. Gregory. (Testimony of Denise Blodig, Trial Transcript 21:15 to 21:17).

- Ms. Blodig acknowledged that the reason she was the owner and Mr. Gregory was not the owner was because she [Ms. Blodig] had credit and Mr. Gregory did not have credit. (Testimony of Denise Blodig, Trial Transcript 21:18 to 21:22 and 23:16 to 23:18).

- Ms. Blodig was the 50% owner of Elizabeth U Stor, LLC and testified that she was the sole owner of the Elizabeth U Stor project. (Testimony of Denise Blodig, Trial Transcript 21:23 to 21:25).

- Ms. Blodig was a 50% owner of Sandy Hollow, the owner and developer of the Preserve at Deerfield. (Exhibit 25 – Operating Agreement of Sandy Hollow)(Testimony of Denise Blodig, Trial Transcript 22:20 to 22:22.

- The entities Elizabeth U Stor, LLC and Sandy Hollow Development LLC were the corporate vehicles used by Defendants to perpetuate fraud upon Ms. Bromberg.

- Although Ms. Blodig was the 50% owner of Sandy Hollow, and Mike Gibbons was the other 50% owner of Sandy Hollow, Mike Gibbons identified his role in Sandy Hollow as "Gene's Partner" and that "Gene and I were 50/50 members on the project." and that "Gene and I were partners on the deal. (Testimony of Mike Gibbons, Trial Transcript 135:13 to 135:15 and 142:6 to 145:12).

- Ms. Blodig was aware that Mr. Gregory and Mike Gibbons went out and raised money for Sandy Hollow from some investors. (Testimony of Denise Blodig, Trial Transcript 25:7 to 25:10).

- Although Mr. Gregory was not a member of Sandy Hollow, Mr. Gregory signed loan documentation and deeds of trust on behalf of Sandy Hollow purporting to be a Member of Sandy Hollow. (Exhibits 1, page 6, Exhibit 6, page 2)(Testimony of Denise Blodig, Trial Transcript 25:21 to 26:8 and 31:13 to 31:18).

- Ms. Blodig was familiar with the loan transaction with Mr. Archer, knew Mr. Archer and knew that Mr. Archer had invested in the company. (Testimony of Denise Blodig, Trial Transcript 27:1 to 27:5).

- Ms. Blodig acknowledged that she knew that Sandy Hollow had borrowed $950,000 from the investors and used the money as a down payment on the property. (Testimony of Denise Blodig, Trial Transcript 31:21 to 31:24).

- Ms. Blodig signed loan documentation relating to the Preserve at Deerfield as a member of Sandy Hollow. Exhibit 11.

- Although Terry Gibbons was not a member of Sandy Hollow, Terry Gibbons signed loan documentation on behalf of Sandy Hollow purporting to be a member of Sandy Hollow. (Exhibit 11)(Testimony of Denise Blodig, Trial Transcript 32:19 to 34:3).

- Ms. Blodig was involved in the first loan from Ms. Bromberg for $93,500.00 as she was the owner of the property on High Street pledged as security for the loan. Although Mr. Gregory was not the owner of the property on High Street, Mr. Gregory signed the Deed of Trust. (Exhibit 14)(Testimony of Eugene Gregory, Trial Transcript 168:8 to 169:2)

- Ms. Blodig was directly involved in the second loan from Ms. Bromberg for $87,000.00, having personally executed a Deed of Trust on property in Blue River, Colorado. (Exhibit 15)(Testimony of Denise Blodig, Trial Transcript 36:7 to 37:12).

- Ms. Blodig was directly involved in the third loan from Ms. Bromberg for $44,000.00, having personally signed the note as Borrower and having signed the deed of trust on property in Blue River, Colorado. (Exhibit 16)(Testimony of Denise Blodig, Trial Transcript 37:13 to 38:9).

- Ms. Blodig was directly involved in the fourth loan from Ms. Bromberg for $121,000,00, having personally signed the note as Borrower and having signed the deed of trust on property in Breckenridge, Colorado. (Exhibit 17) (Testimony of Denise Blodig, Trial Transcript 38:10 to 38:22).

- Ms. Blodig was directly involved in the fifth loan from Ms. Bromberg for $272,272,00, having personally signed the note and an irrevocable fee agreement as Borrower and having signed the deed of trust on property in Elizabeth, Colorado, known also as the Elizabeth U Stor. (Exhibit 18) (Testimony of Denise Blodig, Trial Transcript 38:23 to 40:10).

- Ms. Blodig was directly involved in the sixth loan from Ms. Bromberg for $361,134,06, having personally signed the note and an irrevocable fee agreement as Borrower. (Exhibit 19) (Testimony of Denise Blodig, Trial Transcript 40:14 to 41:16).

- At the time Ms. Blodig signed the loan agreement with Ms. Bromberg in May of 2005, Ms. Blodig was aware of the $950,000.00 in loans made by the investors. (Testimony of Denise Blodig, Trial Transcript 41:17 to 42:2 and 42:11 to 42:21).

- Although she was aware of the loans and the investors in May of 2005, Ms. Blodig made no effort to advise Ms. Bromberg of their existence. (Testimony of Denise Blodig, Trial Transcript 55:10 to 56:20).

- Despite being the owner of the Elizabeth U Stor property, Ms. Blodig claims she was unaware of a side deal made by Mr. Gregory which netted Mr. Gregory a payment of $150,000.00 on the sale of the Elizabeth U Stor property, a property Mr. Gregory did not own. (Testimony of Denise Blodig, Trial Transcript 43:24 to 44:25).

- When asked about the $147,000.00 payment Mr. Gregory received from Mr. Weimer from the sale of the Elizabeth U Stor, Ms. Blodig responded "his business and accounts are his accounts." (Testimony of Denise Blodig, Trial Transcript 45:7 to 45:8).

- In a personal financial statement signed by Ms. Blodig, Mr. Gregory and Ms. Blodig list assets of over $19,000,000.00. All of the assets are in the name of Ms. Blodig, none of the assets are in the name of Mr. Gregory. (Exhibit 24) (Testimony of Denise Blodig, Trial Transcript 45:18 to 46:15).

- Ms. Blodig is the owner of all of the projects that Mr. Gregory is working on. (Testimony of Denise Blodig, Trial Transcript 46:12 to 46: 15).

Conclusion

47. The debt owed by the Debtors to Ms. Bromberg was for money, property, services, or an extension, renewal, or refinancing of credit and was obtained by Defendants Gregory and Blodig through false pretenses, a false representation and/or actual fraud. Through both active participation and a reckless indifference to the actions of her husband, Defendant Blodig has assisted and enabled Defendant Mr. Gregory to commit massive fraud on many victims, including Plaintiff, under false pretenses. For these reasons, the debt owed by Defendants Eugene Gregory and Denise Blodig to Ms. Bromberg is non-dischargeable by either Defendant under 11 U.S.C. § 523(a)(2).

48. WHEREFORE, Plaintiff Rose Bromberg asks for judgment in her favor and against Defendants Eugene Gregory and Denise Blodig in the amount of $742,315.59 and to determine that said judgment is non-dischargeable as to both Defendants. Ms. Bromberg also requests an award of her costs and attorneys' fees, and any other relief deemed appropriate.

Respectfully submitted this 15th day of March, 2013.

OLONA & ASSOCIATES, P.C.

Richard G. Olona, #17940
7472 S. Shaffer Lane, Suite 130
Littleton, Colorado 80127
(303) 433-1699
(303) 433-1614
olonalaw@aol.com
*Attorneys for Plaintiff Rose Bromberg*

## CERTIFICATE OF SERVICE

I certify that on this 15th day of March, 2013, a true and correct copy of the foregoing Plaintiff's Closing Argument was sent via E-Mail, Facsimile or postage pre-paid, in the U.S. Mail to the following:

| | |
|---|---|
| Cynthia Skeen, Chapter 7 Trustee<br>PO Box 218<br>Georgetown, CO 80444 | David S. Oppenheim, Esq.<br>Jeffrey C. Culbertson, Esq.<br>1900 West Littleton Blvd.<br>Littleton, CO 80120 |
| John F. Hensley, Esq.<br>Hensley & Kennedy, PC<br>1790 30th Street, Suite 435<br>Boulder, Colorado  80301 | U.S. Trustee<br>999 18th Street<br>Suite 1551<br>Denver, Colorado  80202 |

/s/ Barbara
Olona & Associates