**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: ) | |
| ) | |
| EUGENE ALLEN GREGORY ) | Case No. 10-35903-MER |
| SSN: XXX-XX-9283 ) | |
| ) | |
| DENISE MARYANNE BLODIG ) | |
| SSN: XXX-XX-9608 ) | |
| ) | Chapter 7 |
| Debtors. ) | |
| _____ ) | |
| ) | |
| ROSE BROMBERG ) | |
| ) | Adv. Proc. No. 11-01011 MER |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| EUGENE ALLEN GREGORY and ) | |
| DENISE MARYANNE BLODIG ) | |
| ) | |
| Defendants. ) | |

___

**DEFENDANTS' CLOSING STATEMENT**
___

      **COMES NOW** Defendants Eugene Allen Gregory and Denise Maryanne Blodig ("Defendants"), for this closing statement in the above action matter, and state as follows:

**Introduction**

      As the Court is aware this matter arose of a series of loans by and between the Plaintiff and Gene Gregory, also eventually involving Ms. Denise Blodig as well. These loans culminated in an April 21, 1998 loan comprised of the entire outstanding balance from all the other loans, which have been rolled over and were secure by the property owned by the Elizabeth U-Store LLC (See Plaintiff's **Exhibit 18** page 8). The Plaintiff waited until the September 23, 1999, after the note was in default, (17 months after the date of the note) before recording the deed of trust against the U-Store putting it in a second position

behind the loan of Matrix Capital Bank. At the time, the principal amount outstanding and in default was $272,272.00. For the next five plus years Ms. Bromberg did nothing. Even though the loan is in default, she took no action and simply sat back and accumulated interest.

During this time, Mr. Gregory testified that he had been attempting to sell the U-Store property (Mr. Gregory was its manager) for at least $1.2 million dollars. The property was not making money and was in fact losing between fifty and one hundred thousand dollars a year (See testimony of Mr. Gregory Transcript 205:14-206:2). As testified by Mr. Gregory, in the fall of 2004, Matrix Capital Bank began exerting pressure regarding the loan and Mr. Gregory was unable to either refinance it or sell the property. Thus, on January 11, 2005, the Elizabeth U-Store was put into bankruptcy (See Defendants' Exhibit I).

The reason for the bankruptcy was because to Mr. Gregory, credit was everything. Mr. Gregory had to have credit in order to continue development of the Sandy Hollow Project. As the Court will recall, the Sandy Hollow Project was a 26 lot development which had been appraised at 10.3 million dollars (See Exhibit H page 3). In reliance upon this appraisal, Mr. Gregory and Mr. Gibbons, the two managers of Sandy Hollow LLC (Sandy Hollow LLC was similarly 50% owned by Mr. Gibbons and 50% by Ms. Blodig) set out to raise $900,000 to put down to buy the property in the early fall of 2004.
However, Mr. Gregory feared should the Matrix Capital Bank foreclose upon the U-Store and call in the loan, the Sandy Hollow Project would be in jeopardy due to Mr. Gregory and Ms. Blodig's credit being hit and Mr. Gregory believed would be a deficiency judgment. As testified by Mr. Gregory (at Transcript 213:2-214:11 and Defendants' Exhibit P, page 34:17-34:19), Mr. Gregory was under the impression the bank would attempt to sell the property at between $400,000 and $600,000, resulting in a massive deficiency on the loan on the property. It was believed that this deficiency would be entered as a judgment against Mr. Gregory and Ms. Blodig and thereby ruins the Sandy Hollow Project. Accordingly, and as mentioned above, the U-Store was placed into bankruptcy so that Mr. Gregory could attempt to either refinance the property or find a buyer for the property under the protection of the bankruptcy stay. During the spring of 2005 Mr. Gregory worked hard to locate buyers for the U-Store all the while believing it was worth at least $1.2 million dollars. Mr. Gregory attempted to sell the property to Ms.

Bromberg for the amount of $1 million dollars, which he believed would result in at least a $200,000.00 recovery of her deed of trust on the property. She refused (See testimony of Mr. Gregory Transcript 189:9-189:17). Mr. Gregory then approached Mr. Weimer regarding the purchase of the property. Mr. Weimer agreed to buy the property for $1 million dollars, but Mr. Gregory informed Mr. Weimer that the property must be sold under the supervision of the Bankruptcy Court (Transcript 216:16-216:19). The Court held an emergency hearing on or about May 24, 2005 (Defendants' Exhibits T and U) which Ms. Bromberg attended. Ms. Bromberg did not object to the sale of the property to Mr. Weimer for $1 million dollars even though Mr. Gregory had informed her that the property was $1.2 million (See Exhibit U). The U-Store was given permission to sell the property on May 24th.

    As testified by Mr. Gregory, because of the possibility that the Court would not grant the Motion to sell the U-Store, a settlement statement had not been prepared and neither Mr. Gregory nor Mr. Weimer knew the total amount it would cost to sell (or, if Lotus lien would need to be satisfied). Subsequent to the Court's Order on May 24th, Mr. Weimer then told Mr. Gregory he would not pay him a penny more than $1 million dollars to close the deal. (See testimony of Mr. Weimer at 161:5-161:7) and Mr. Gregory at 192:3-192:6). Mr. Gregory then brought $40,000.00 of his own money (not money of the U-Store) to ensure that the deal closed which is evidence by Plaintiff's Exhibits 38, (P. 1,line item 204, deposit by seller) and Exhibit 39 (deposit by seller) and by Mr. Gregory's testimony (Transcript 204:14-205:11). Because he was bringing his own personal money to the closing of the Elizabeth U-Store LLC's property, Mr. Gregory asked that he be allowed an opportunity to recover his money and split any proceeds from any sale. Mr. Weimer's testimony as may be used by the Plaintiff is suspect at best, as he testified that he did not recall the U-Store even being in bankruptcy. (See Testimony of Mr. Weimer at 156:7-156-13).

    Mr. Gregory had been attempting to sell the property for five years and had been unsuccessful under this highly unlikely that the property would sale. Upon and for which he would recover the money. Nonetheless, Mr. Gregory believed that if the property were to sell at $1.2 million dollars (he had always believed that the property was worth $1.2 million dollars) he would receive his money back based upon

the following math: Mr. Gregory believed that Mr. Weimer would take a commission of 10% on the property sale resulting in a net proceeds of $1,080,000. Mr. Gregory would then receive his 50% proceeds resulting in the $40,000 he brought to closing contributed so that the matter could close. (See testimony of Mr. Gregory, Transcript 226:18-227:18)  Mr. Gregory never attempted to hide anything, and brought the money from his own account.

Immediately prior to the closing of the Elizabeth U-Store, due to the Court's Order requiring Mr. Gregory find substitute collateral for Ms. Bromberg's second position deed of trust, Mr. Gregory and Ms. Bromberg closed on the "transferring" of the promissory note, rolled over again and placed against the "net proceeds" that either Denise Blodig or Mr. Gregory would receive from the sale of lots at the Sandy Hollow Project. (Plaintiff's Exhibit 19). Mr. Gregory had previously met with Ms. Bromberg regarding this matter and discussed the fact that he could not place a deed of trust against the property because the property was also owned by Mr. Gibbons through and LLC. Mr. Gregory informed Ms. Bromberg that he had a bank loan and $950,000 worth of investors on the project that would have to be paid first.

Eventually, the Sandy Hollow Project fell apart and Mr. Gregory and Ms. Blodig subsequently filed for bankruptcy protection after sinking hundreds of thousands of dollars of their own money into the project. They were never paid any "net proceeds" from any of the lots and as testified by Mr. Gibbons, Sandy Hollow never distributed any money to any of its members or managers (See testimony of Mr. Gibbons, Transcript 139:24). Moreover, the Defendants paid Sandy Hollow $315,000 to purchase a lot to build their home. This was paid in cash as was evidenced by Exhibit O).

Plaintiffs brought this suit under 523(a)(2) objection to discharge on the basis of fraudulent, inducement, concealment or outright fraud. Plaintiff has not met her burden of proof in this matter. Plaintiff must demonstrate by a preponderance of the evidence that Defendants' made the false representations (or omissions) with the intention of deceiving the Plaintiff, that Plaintiff relied on the representations, that the reliance was reasonable founded, and Plaintiff suffered a loss as a result of the reliance (see Pham v. Baccam, 178 BR 528 (M.D. Fla, 1995).   Plaintiff was wholly unable demonstrate any of these elements in any respect.

4

    **B.**     **Denise Blodig**

The Plaintiff admitted that she had never communicated in any way with Ms. Blodig. She had never received any documents from her, correspondence, or communications either written or verbal in any manner, and in fact, never relied on anything Ms. Blodig said or did not say. (See testimony of Ms. Bromberg, Transcript 81:17-82:13). The Plaintiff also testified that she neither relied upon any statement made by Ms. Blodig, <u>nor did Plaintiff ever rely upon a lack of any statement</u> by Ms. Blodig. (Id.) It is inconceivable that via an absolute lack of reliance by the Plaintiff in any fashion on any statement or lack thereof by Ms. Blodig that she can claim a fraudulent concealment on behalf of Ms. Blodig.

Moreover, as testified to by Plaintiff, the relationship between Ms. Bromberg and Ms. Blodig was simply one of a debtor and creditor (Transcript 116:24-117:5). The Plaintiff now asserts that Ms. Blodig had some higher duty to notify Ms. Bromberg of matters that Ms. Blodig did not know of, solely by her ownership of a company. This is absurd, and despite researching the matter, Defendants' have been unable to locate any supporting law for imputing knowledge of a tort upon an individual via the individuals ownership of a company. Regardless, Ms. Blodig did not have any involvement in the sale of the U-Store, did not have any involvement in the agreement between Mr. Gregory and Ms. Weimer, and had no discussions with the Plaintiff regarding the transferring of the loan from the U-Store to Sandy Hollow. History of their dealings had always been one of simple debtor and creditor with both parties being signatory to agreements. Now, Plaintiff argues that as an owner of the entities (the U-Store and Sandy Hollow), Ms. Blodig somehow became vested with a duty to investigate what it is that a creditor knew or didn't know regarding a personal loan she took no part in negotiating. This is absurd.

By her own admission, and as cited above, Plaintiff did not rely upon either the silence of Ms. Bodig or upon any statement she made. Plaintiff is wholly unable to meet any of the elements necessary to make a claim of non-dischargability against Ms .Blodig under 523(a)(2)(b). Moreover, Plaintiff cannot make a claim under 523(a)(2)(a) as she was unable to testify with any creditability that she had been induced to make any transaction whatsoever based upon any written instrument. Ms. Bromberg did attempt to testify that a financial statement that she likely came across in discovery constituted a

5

document she had seen before. However, she was unable to identify when, where or why she had previously seen the document and never testified as to its influence on her decision making. Accordingly, as Ms. Bromberg's creditability with respect to this document is in question, and she never testified as to any reliance upon any documents provided to her regarding the financial status or Mr. Gregory or Ms. Blodig, she did not meet her burden of proof pursuant to 523(a)(2)(a) regarding the financial statement of a debtor or insider. Thus, under no circumstances can the Plaintiff maintain an action against Ms. Blodig.

Finally, and as will be repeated again below, <u>Ms. Bromberg testified on cross examination that the **reason** she moved her loan from the U-Store to the Sandy Hollow Project was because she was afraid she would lose her secured position in the U-Store if Mr. Gregory converted the matter to a Chapter 7</u> (see Transcript 109:10-14) . **Ms. Bromberg made a business decision** brought about by a business decision being made by Mr. Gregory. There is no fraud or concealment in that business decision and the Plaintiff's testimony that she relied upon nothing but her fear of having the matter converted to a Chapter 7 (Id.) belies her true reliance; she moved the loan for fear of being wiped out in a foreclosure and a Chapter 7 and not due to any knowledge of any other deed of trust holders on the property or deals made by Mr. Gregory. Her reliance was based on a business decision. This admission is fatal to any claim that the Plaintiff may have against Ms. Blodig, or for that matter, Mr. Gregory.

Pursuant to 11 U.S.C. §523(d), Ms. Denise Bodig seeks her attorney fees in this matter against the Plaintiff.

### C. Gene Gregory

Similarly, the Plaintiff has not met her burden with respect to Mr. Gregory and the allegations made pursuant to 523(a) (2). As was testified by Mr. Gregory, there was no intent to mislead or conceal anything from Ms. Bromberg. In fact, Ms. Bromberg was wholly unable to prove any reasonable reliance on her part that lead to any damages, or for that matter, any damages.

As the Court may recall, Plaintiff testified that if she understood Mr. Gregory and Ms. Blodig would make $2 million dollars out of their share of the Sandy Hollow Project, she would have been satisfied with that and still entered in to the agreement because the amount projected by Mr. Gregory of

6

$2 million dollars would have satisfied the amount she was owed. (See Transcript 110:3-11-:6) As demonstrated by the appraisal (See Exhibit H) and the testimony of Mr. Michael Gibbons (See Transcript P. 139:3), the parties expected to make at least $2 million dollars from their involvement on the project. Thus, by her own admission, the existence or non-existence of other "investors" was immaterial to her decision: <u>her decision was based upon the amount expected to be made</u> and <u>fear of losing her security through a chapter 7 conversion of the U-Store</u>.

Clearly, Mr. Gibbons and Mr. Gregory, in reliance upon Exhibit H, expected to make at least $2 million dollars apiece (See Exhibit H page 35 and previously cited transcript testimony). Further, even had a concealment or misrepresentation been made, Plaintiff suffered no damages. As stated by Plaintiff in her testimony, Plaintiff was motivated by a fear of losing her investment in a Chapter 7 and not by Mr. Gregory luring her into a different project. This fear of the Chapter 7 was very real and Mr. Gregory testified (See Transcript 213:2-214:11 and) that he was similarly concerned about a deficiency judgment and bankruptcy wherein Matrix Capital Bank would take the property leaving Ms. Bromberg with nothing. Similarly, as testified by Mr. Gregory (in the event that occurred, Mr. Gregory anticipated filing personal bankruptcy thereby eliminating any recovery of the amounts owed to Plaintiff. See Transcript 212:20-212-22)

Finally, aside from Plaintiff's inability to demonstrate reasonable alliance, any concealment, or even damages, it is worth noting that the contract was not even breached. As testified to by Mr. Gibbons, Sandy Hollow LLC never disbursed any funds to any members or managers related to the project, and in fact, both Mr. Gregory and Mr. Gibbons lost more than $100,000 in the project. The agreement stated that the Defendants would pay plaintiff out of the 'net proceeds' of the sales of the homes. There were no net proceeds. Thus, by the terms of the agreement (See Plaintiff's Exhibit 19) Mr. Gregory and Ms. Blodig did not even breach their contract with Ms. Bromberg as there were no net proceeds from the sale of any of the properties.

Again, Plaintiff was the party that drafted these documents and any ambiguity should be construed against her. To the extent that the parties might disagree over what net proceeds from the sale of the properties would mean, the interpretation accorded to that statement should be that of with Mr. Gregory and Ms. Blodig as they did not draft the document. Mr. Gregory testified that net proceeds would mean any and all proceeds after all the expenses (See transcript at 223:5-223:12). Further, the bank was not fully paid and thus, even absent the existence of any of the other investors, Plaintiff still would not have received any distributions from the "net proceeds" because there were none to have. Thus, there are no damages and there was not even a breach of the fee agreement. In fact, the amount claimed by Plaintiff is inflated. As testified by Plaintiff (see Transcript 93:25-94:4), approximately $40,000 of the $272,272.00 was put in by Mr. Badwin, and not even loaned by Plaintiff.

David Archer, one of the investors, also testified in this matter. Ultimately, his testimony was entirely irrelevant, as his understanding of his loan, and other encumbrances on the project, have nothing to do with whether those encumbrances were concealed from Plaintiff or if she relied upon them, or if she was damaged. His testimony did nothing to establish any of the elements necessary for Plaintiff to prevail.

However, Mr. Archer's own testimony was inconsistent with the documents he had drafted. (Mr. Gregory did not draft the agreement with Mr. Archer, see Transcript 187:17-187:20). In fact, Mr. Archer's loan agreement related to the Property dated August 4, 2004 (page 4 of Exhibit 37) stated it was to ….be of equal priority of any and all other deeds of trust relative to private financing provided to the borrower on or before April 1, 2005" Mr. Archer's on loan agreement destroys the very purpose of his testimony, to the extent it was relevant.

### D. The U-Store

Ms. Bromberg's second claim for relief against Mr. Gregory lies with the assertion of fraudulent concealment of a deal made with Mr. Weimer for the sale of the U-Store.

8

The fact that the U-Store was sold to Mr. Weimer at $1 million dollars is in no way fraudulent nor concealment and in no way had any impact upon Ms. Bromberg's decision. While on its face the agreement to sell to Mr. Weimer sounds as though Mr. Gregory actively hid things from Mr. Bromberg, testimony actually revealed only honest actions by Mr. Gregory.

As stated above, if the bank had obtained relief from stay and sold the property at a deficiency, Mr. Gregory would have been forced to file bankruptcy and Plaintiff would have received nothing from her secured position. Accordingly, and as testified to by Mr. Gregory (and cited above), he actively sought to sell the property but was unsuccessful.

As Mr. Gregory explained, Mr. Weimer, who had also invested heavily into the Sandy Hollow Project, agreed to purchase the property for $1 million dollars. An emergency motion was filed to sell the property for the $1 million dollars which was granted May 24 after notice and a hearing. In its order, the Court ordered the principals of the U-Store to locate alternate security for Plaintiff's note (see Exhibit U). Again, Mr. Gregory believed the Sandy Hollow project would generate at least $2 million dollars (which Plaintiff testified was adequate), and thus, alternative adequate security was provided by Mr. Gregory within days after the Court granted the motion to sell the property to Mr. Weimer. Thus, Mr. Gregory and Ms. Blodig on the one hand and Ms. Bromberg on the other, entered into the agreement "transferring" the note to the Sandy Hollow Project. Subsequent to the Court's order, the HUD One Statement was issued indicating the necessity for more than $1 million dollars to be paid at closing. As Mr. Gregory testified, this is not known until after the Court had agreed to the sale and after he and Ms. Bromberg had reached an agreement on "transferring" the promissory note.

Thus, with his own money, Mr. Gregory put in $40,000 into the sale as cited above. However, these funds were not from the "owner" (the U-Store) but from Mr. Gregory himself from his individual bank account.

Mr. Weimer testified that the deal all along, even prior to the Court's ruling of May 24 was that Mr. Gregory would share in this sale proceeds. However, and as stated by Mr. Weimer, he did not necessarily remember things very well. It makes no sense for Mr. Gregory to volunteer to pay money into

9

the sale of a property he did not know he would have to pay. In other words, prior to the Bankruptcy Court's decision on of May 24 Mr. Gregory had no idea whether or not the property could even be sold. Yet, Mr. Weimer claims to have had no recollection that the property was ever in bankruptcy. This is a pretty key lapse in memory given his testimony in favor of the Plaintiff's claims.

      It is agreed that a deal was struck with Mr. Weimer, and that based upon a hopeful sales price of $1.2 million Mr. Gregory would hopefully get back his $40,000 he put in. As cited above, it was believed the property would be sold at, hopefully, $1.2 million dollars. Mr. Gregory believed that Mr. Weimer would obtain a 10% commission by brokering the deal. 10% of 1.2 million is $120,000 leaving $80,000 to be "split" between Mr. Weimer and Mr. Gregory. This would result in a payback to Mr. Gregory of the $40,000, the amount he actually contributed. Mr. Gregory also had no idea if and for what price the property would sell. Mr. Gregory had been attempting to sell the property for $1.2 million dollars for years and had been completely unsuccessful. Thus, the idea that he had reached some type of cabal with Mr. Weimer by duping Plaintiff into releasing her position is ludicrous at best. To ask a rhetorical question, why would Mr. Gregory believe the property could be sold in excess of $1.2 million dollars when the best he was ever able to do over 5 years was sell it for $1 million dollars. Simply put, the transaction at first blush sounds dishonest, and although the Plaintiff has certainly painted a picture of dishonesty of Mr. Gregory, once the finder of fact looks beneath the surface there was obviously only an attempt to recoup the monies owed. Further, it would have been impossible for Mr. Gregory to have known of the closing costs prior to the Court's Order granting the sale, as Plaintiff's Deed of Trust was recorded against the property, requiring the seller to have brought several hundred thousand dollars to the closing, not just the Forty Thousand dollars that was brought. It is worth noting that the closing occurred within 1week of the Order granting the sale. After the Order was the only reasonable time a closing statement could have been prepared, and thus, the only logical time any 'deal' could have been struck.

      At a minimum, even if this Court were to find culpability on Mr. Gregory's part with respect to the deal of Mr. Weimer that culpability would be limited. Again, absent the sale to Mr. Weimer, Plaintiff would make nothing, the property would have likely been taken by Matrix Capital Bank (Mr. Gregory

believed it would be) eliminating any ability of Plaintiff to recover. Further, Mr. Gregory put $40,000 of his own money into the transaction. Thus, to the extent the Court were to find some concealment took place, the amount of funds received by Mr. Gregory, as alleged by Ms .Bromberg, should be reduced by the $40,000 he actually put in. However, again, none of this is material to the decisions Plaintiff made. Plaintiff happily made the decision and transferred the property for fear of a Chapter 7 bankruptcy. Thus there can be no reliance upon any concealment by Mr. Gregory of his deal and in fact, at no time did Ms. Bromberg ever testify that she would have acted differently had she known.

Finally, there was no writing upon which Ms. Bromberg relied. This claim was brought under 523(a)(2). 523(a)(2)(b) states a writing must have been relied upon for a claim such as this. Not only does no such writing of Mr. Gregory's financial condition exist, none was relied upon. Moreover, as insiders of Sandy Hollow the allegations of fraudulent statements as to the viability of the Sandy Hollow project would be considered as statements of the financial condition of an insider and thus subject to the written requirement of § 523(a)(2)(B). (See in re *Phillips*, 27 BR 646 (Bank. MD PENN 1982) no writing exists upon which a misrepresentation of a financial condition of the Defendants, or an insider, exists thereby defeating Plaintiff's claim. Thus, having not relied upon any writing (having reviewed a document produced by Matrix Capital Bank and produced in this litigation, Ms. Bromberg decided she had in fact seen, but never testified one was relied upon) it is impossible for Ms. Bromberg to prevail on any of her claims as no document with false information was ever provided to her upon which she relied.

This matter must be dismissed. It is a shame that many people lost money in a real estate venture. Certainly, nobody spends hundreds of thousands of dollars of their own money hoping to loss it. The Gregory's certainly would have preferred to have had net proceeds with which to pay Ms. Bromberg as, had that been the case, it would have meant that project was a success and they had made money. Instead, the project was a failure and no one was paid. Ms. Bromberg refusing to accept the fact that she had backed the wrong horse has asserted groundless claims against both Mr. Gregory, and especially Ms.

Blodig related in this action. As described above, Ms. Bromberg has wholly failed in any aspect to prove any connection between her and Ms. Blodig and has failed in every respect to prove reliance upon material statement or concealment by Mr. Gregory or even prove any damages based upon the description above. For these reasons the Court should rule in favor of the Defendants, Denise Blodig and Gene Gregory, and find any amounts which may be owed to Ms. Bromberg are dischargeable and deny any and all claims under 523(s)(2).

**DATED** this 15th day of March, 2013.

MILLER & LAW, P.C.

/s/ *Jeffrey C. Culbertson*
David S. Oppenheim, #11004
Jeffrey C. Culbertson, #34806
1900 West Littleton Boulevard
Littleton, CO 80120
303-722-6500 telephone
303-722-3894 fax
dso@lpmlaw.com  Email
jcc@lpmlaw.com Email

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 15th day of March, 2013, a true and correct copy of the foregoing **DEFENDANTS' CLOSING STATEMENT** was served by placing same in the U.S. Mail, first-class, postage prepaid and addressed to the following:

WATROUS EHLERS MIELKE
& GOODWIN, LLP
Kevin L. Ehlers
7472 S. Shaffer Lane, Suite 100
Littleton, Colorado 80127
ehlers@wemglaw.com

HENSLEY & KENNEDY, P.C.
John F. Hensley, #10525
1790 30th St., Suite 435
Boulder, Colorado 80301
jfh@hensleyandkennedy.com

Cynthia Skeen
P.O. Box 218
Georgetown, CO 80444
Chapter 7 Trustee

OLONA & ASSOCIATES, P.C.

Richard G. Olona
7472 S. Shaffer Lane, Suite 130
Littleton, Colorado 80127
ononalaw@aol.com

U.S. TRUSTEE
999 18th St.
Suite 1551
Denver, Colorado 80202

*/s/ Bethany Detwiler*
Bethany Detwiler